# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

IRA J. GAINES and LANNY LAHR,

    Plaintiffs

v.

BRIAN KEASBERRY and AARIF JAMANI,

    Defendants

AND ALL RELATED COUNTERCLAIMS
AND THIRD-PARTY CLAIMS

Case No.: 2:22-cv-01206-APG-VCF

**Order Granting in Part Motion to Dismiss**

[ECF No. 9]

Plaintiffs Ira Gaines and Lanny Lahr sue defendants Brian Keasberry and Aarif Jamani for the alleged fraudulent transfer of Series A Preferred stock in a company called Gen2 Technologies, Inc. (Gen2). ECF No. 6.  Keasberry and Jamani filed an answer and counterclaim against Gaines, Lahr, Daniel Serruya, and Michael Kovacocy. ECF No. 7 at 10.  Keasberry and Jamani asserted claims for civil conspiracy and aiding and abetting against all counterdefendants, and breach of fiduciary duty and equitable indemnity against Serruya and Kovacocy.[1]

Gaines and Lahr move to dismiss the counterclaims on a variety of grounds.  Keasberry and Jamani oppose.  I grant the motion in part, with leave to amend.

## I.  BACKGROUND[2]

Keasberry founded Gen2 and served as its president, chief executive officer (CEO), secretary, treasurer, and as a director until he resigned in July 2017. ECF No. 7 at 11.  In 2016,

---

[1] Keasberry and Jamani also asserted claims for concert of action and abuse of control, but they agree those claims should be dismissed. ECF No. 11 at 9, nn.5-6.

[2] The background section is taken from the counterclaimants' allegations, which I take as true at this stage of the proceedings. *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017).

1 while Keasberry was still in control of Gen2, Gen2 entered into two promissory notes to raise

2 money for the company, one with Gaines and one with Lahr, each with a maturity date of

3 February 10, 2017. *Id.* at 16.  Keasberry personally guaranteed the notes if Gen2 did not repay

4 the debt. *Id.*  Gen2 did not repay the debt by the original maturity date. *Id.*

5       In June 2017,[3] Gen2's board of directors approved the creation of Series A Preferred

6 stock, which was a single share issued to Keasberry that entitled him to voting power equal to

7 110% of Gen2's common stock. *Id.* at 11-12.  Keasberry thus had the voting power to elect new

8 directors at a shareholder meeting and maintain control of Gen2 after his resignation. *Id.* at 12.

9       In July 2017, Serruya took over as president and CEO, and was a director of Gen2. *Id.*

10 Serruya hired Kovacocy. *Id.*  According to the counterclaims, Serruya began diluting the

11 shareholders' equity and paid out over $2 million in compensation to the company's officers and

12 directors. *Id.*  Additionally, the counterclaims allege that Serruya and Kovacocy deliberately

13 failed to repay the promissory notes that Keasberry guaranteed during their tenure. *Id.* at 16.

14       In November 2020, Keasberry and Jamani executed a stock purchase agreement under

15 which Jamani agreed to purchase the Series A stock for $30,000. *Id.* at 18.  Jamani was to pay

16 $20,000 within six months of the date of the agreement, and the stock would be transferred to

17 him after he did so. *Id.*

18       In February 2021, Keasberry (who still owned the Series A stock) used his majority

19 voting power to elect himself and Jamani as Gen2's directors, after which they held a board

20 meeting and removed Serruya as president and CEO. *Id.* at 12.  Keasberry and Jamani appointed

21

22 [3] The counterclaims identify this date as June 2018, but this appears to be a typographical error
because the Series A Preferred stock was meant to maintain Keasberry's control over Gen2 after

23 he resigned.  Consequently, it makes little sense that the stock was issued nearly a year after he
had already resigned.  Moreover, Keasberry identified the date as June 2017 in a declaration filed
in Nevada state court. *See* ECF No. 9-2 at 18.

1  Keasberry to fill all Gen2's officer positions. *Id.*  Serruya and Kovacocy refused to step down

2  and instead took a series of actions to attempt to maintain control over Gen2. *Id.* at 13.

3  Consequently, in March 2021, Keasberry filed suit in Nevada state court seeking to have himself

4  and Jamani declared Gen2's valid officers and directors (the Control Action). *Id.*

5        For over four years after the original maturity date, Gaines and Lahr took no action to

6  enforce the promissory notes. *Id.* at 16.  But on April 9, 2021, Gaines and Lahr filed suit in

7  Arizona state court against Keasberry (but not Gen2) on the guarantees. *Id.* at 16-17.  Less than

8  two weeks later, Jamani made the first payment of $20,000 to Keasberry under the stock

9  purchase agreement. *Id.* at 19.  In July 2021, the Arizona court entered a default judgment

10  against Keasberry on the guarantees. *Id.* at 17.

11        In August 2021, Gaines and Lahr domesticated the Arizona default judgment in Nevada

12  state court (the Domestication Action). *Id.*  In the meantime, Serruya and Kovacocy filed a

13  motion for temporary restraining order in the Control Action stating that they needed to remain

14  in control of Gen2 so they could file necessary documents with the Securities and Exchange

15  Commission (SEC). *Id.* at 13.  Keasberry moved for summary judgment based on his right to

16  remove Serruya and Kovacocy as directors and officers based on the Series A Preferred stock

17  voting power. *Id.* at 13-14.  The state court granted the injunction for Serruya and Kovacocy to

18  maintain the status quo and ensure Gen2 met its filing obligations. *Id.* at 14.  It also allowed

19  Serruya to schedule an election, which Serruya scheduled for November 12, 2021. *Id.*

20        In September 2021, Gen2's stock transfer agent transferred the Series A stock to Jamani

21  pursuant to the stock transfer agreement between Jamani and Keasberry. *Id.* at 19.  Just a few

22  days later, Gen2 filed a disclosure statement that revealed that Serruya and Kovacocy authorized

23  Gen2 to issue stock to Gaines and Lahr in 2020 and 2021 valued at $225,000 each "for what

1    appears to be no consideration." *Id.* at 19-20.  Serruya also disclosed for the first time in an SEC

2    filing that he allegedly held superior voting power through Series A-1 stock that he had issued to

3    himself that purportedly would trump Keasberry's Series A stock. *Id.* at 13-14.  That led

4    Keasberry to file for relief in the Control Action, arguing that Serruya and Kovacocy were taking

5    actions aimed at undermining the state court's injunction. *Id.* at 14-15.

6         Gaines and Lahr obtained a writ of execution in the Domestication Action to execute on

7    Keasberry's property in Nevada to satisfy the Arizona judgment. *Id.* at 17.  Gaines and Lahr's

8    counsel "communicated with Serruya to coordinate the seizure of" both Keasberry's common

9    stock as well as the Series A stock and sent the writ to Gen2 to seize Keasberry's shares. *Id.*

10   According to the counterclaim, "Gaines and Lahr specifically sought the Series A Preferred

11   Stock, which they identified as a key asset." *Id.*  The night before the November 12 shareholder

12   election, Serruya sent Gaines and Lahr's writ of execution to Gen2's stock transfer agent

13   demanding that the agent convert the Series A stock to common shares held in the name of "Mr.

14   Keasberry c/o Shlomo S. Sherman, Esq." *Id.*  Sherman is Gaines and Lahr's attorney. *Id.* at 18.

15   The agent refused to comply with Serruya's request. *Id.*

16        The election proceeded on November 12. *Id.* at 15.  Jamani voted based on the Series A

17   Preferred stock and Serruya voted based on the Series A-1 stock. *Id.*  Serruya and Kovacocy

18   subsequently announced that they were reelected as Gen2's directors. *Id.*

19        The state court thereafter held an evidentiary hearing in the Control Action and issued an

20   order granting Keasberry and Jamani's summary judgment motion. *Id.*  The court ruled that

21   Keasberry's February 2021 action in removing Serruya from office was valid, so all of Serruya

22   and Kovacocy's actions thereafter were voidable and Keasberry and Jamani were Gen2's valid

23   directors. *Id.* at 15-16.

In July 2022, Gaines and Lahr filed this case, alleging that the transfer of the Series A stock from Keasberry to Jamani was fraudulent. ECF No. 6.  Keasberry and Jamani counterclaimed, essentially asserting that Gaines and Lahr conspired with Serruya and Kovacocy to seize the Series A stock to control Gen2.  Gaines and Lahr now move to dismiss on a variety of grounds.  Serruya and Kovacocy have not appeared in this case.

**II.  ANALYSIS**

In considering a motion to dismiss, I take all well-pleaded allegations of material fact as true and construe the allegations in a light most favorable to the non-moving party. *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017).  However, I do not assume the truth of legal conclusions merely because they are cast in the form of factual allegations. *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1163 (9th Cir. 2017).  A plaintiff must make sufficient factual allegations to establish a plausible entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  Such allegations must amount to "more than labels and conclusions, [or] a formulaic recitation of the elements of a cause of action." *Id.* at 555.

Additionally, claims grounded in fraud must satisfy both this plausibility standard and Federal Rule of Civil Procedure 9's heightened pleading requirement to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  "To properly plead fraud with particularity under Rule 9(b), a pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018) (quotation omitted).

/ / / /

/ / / /

5

A.  **Characterization of the Claims**

Gaines and Lahr contend that the claims against Serruya and Kovacocy are improperly characterized as counterclaims because Serruya and Kovacocy are not plaintiffs.  Gaines and Lahr assert that Serruya and Kovacocy are third-party defendants.  Keasberry and Jamani respond that they can bring in new parties as counterdefendants and the only claim that qualifies as a third-party claim is the one against Serruya and Kovacocy for equitable indemnity.  They request leave to amend to recharacterize the claim if necessary.

Under Federal Rule of Civil Procedure 13(c), a "counterclaim need not diminish or defeat the recovery sought by the opposing party" and "may request relief that exceeds in amount or differs in kind from the relief sought by the opposing party."  Rule 13(h) allows for adding a party to a counterclaim through Rules 19 and 20.  In contrast, a third-party claim is one filed by the "defending party" against "a nonparty who is or may be liable to it for all or part of the claim against it." Fed. R. Civ. P. 14(a)(1).

Gaines and Lahr are incorrect in stating that because the counterclaims add Serruya and Kovacocy to the case, they must be third-party claims.  Parties can be added as counterdefendants under Rules 13(h), 19, and 20.[4]  Most of the counterclaims against Serruya and Kovacocy are properly characterized as counterclaims and not third-party claims because they do not assert that the two new parties are liable to Keasberry and Jamani for Gaines and Lahr's fraudulent transfer claims against Keasberry and Jamani.  However, as Keasberry and Jamani concede, the equitable indemnity claim is a third-party claim.  With this understanding,

---

[4] Gaines and Lahr have not argued that joinder is improper under Rules 19 and 20, so I do not address that issue.

1   Keasberry and Jamani need not amend to clarify that the equitable indemnity claim is a third-

2   party claim, but they may do so as part of an amendment otherwise authorized by this order.

3   **B.  Jurisdiction**

4   　　　Gaines and Lahr argue that the court lacks jurisdiction over the counterclaims because

5   both Jamani and Serruya are Canadian citizens.  Gaines and Lahr contend the counterclaims are

6   not compulsory, and to the extent supplemental jurisdiction applies, I should decline to exercise

7   that jurisdiction because the counterclaims do not arise out of the same case or controversy as the

8   fraudulent transfer claims and would predominate over the fraudulent transfer claims.

9   　　　Keasberry and Jamani respond that because the main action seeks to obtain the Series A

10   Preferred stock and their counterclaims allege an unlawful conspiracy to deprive Jamani of that

11   stock, the counterclaims are compulsory, so no independent jurisdictional basis is needed.

12   Alternatively, they contend that even if the counterclaims are not compulsory, I should exercise

13   supplemental jurisdiction because the counterclaims arise out of the same controversy

14   surrounding the stock as the original claims.

15   　　　Under 28 U.S.C. § 1367(a), if I have original jurisdiction over a civil action, then I also

16   have supplemental jurisdiction "over all other claims that are so related to claims in the action

17   within such original jurisdiction that they form part of the same case or controversy under Article

18   III of the United States Constitution."[5]  This includes "claims that involve the joinder or

19   intervention of additional parties," including counterclaims and third-party claims. 28 U.S.C.

20   § 1367(a); *see also Ambassador Hotel Co. v. Wei-Chuan Inv.*, No. 97-56423, 191 F.3d 459, 1999

21

22   [5] There are exceptions to supplemental jurisdiction, but none apply here. *See* 28 U.S.C. § 1367(a)
     (except "as expressly provided otherwise by Federal statute"); *id.* § 1367(b) (in civil actions

23   where jurisdiction is originally founded on diversity, I do not have supplemental jurisdiction over
     certain claims brought by a plaintiff "when exercising supplemental jurisdiction over such claims
     would be inconsistent with the jurisdictional requirements" of diversity jurisdiction).

WL 680286, at *1 (9th Cir. 1999).  Claims form part of the same case or controversy where they "derive from a common nucleus of operative fact" and are such that they "would ordinarily be expected to [be tried] in one judicial proceeding." *Arroyo v. Rosas*, 19 F.4th 1202, 1209-10 (9th Cir. 2021) (quotation omitted).

Regardless of whether Keasberry and Jamani's counterclaims are characterized as compulsory or permissive, they derive from a common nucleus of operative fact regarding Gen2's debt, Keasberry's guarantee of that debt, Serruya's conduct while in control and attempting to retain control of Gen2, and how that impacts whether the stock transfer from Keasberry to Jamani was fraudulent.  For example, according to the counterclaims, Serruya caused Gen2 to issue stock to Gaines and Lahr valued at $225,000 each for no consideration. The counterclaims allege that the stock transfers "were either payments to have them pursue Keasberry in an effort to seize the Series A Preferred Stock, or payments on the Promissory Notes but not applied to the debt so as to allow Gaines and Lahr to pursue Keasberry to steal the Series A Preferred Stock." ECF No. 7 at 20.  If it is true that Gen2 paid Gaines and Lahr on the debt, that may impact whether the stock transfer between Keasberry and Jamani was fraudulent because some of Gaines and Lahr's fraudulent transfer claims require proof that Keasberry was insolvent at the time he transferred the Series A stock to Jamani. *See* ECF No. 6 at 6-7.  If Gen2's debt was paid in full or part by the no-consideration stock transfers to Gaines and Lahr, then Gaines and Lahr may not have been Keasberry's creditors or Keasberry may not have been insolvent because his outstanding debt on the guarantees would have been reduced or eliminated.

Additionally, the third-party equitable indemnification claim is, by its very nature, part of the same controversy because it asserts that Gaines and Lahr's claims against Keasberry are the "result of the faults of Serruya and Kovacocy, as directors and officers of Gen2." ECF No. 7 at

24.  That claim is based on the allegations that Serruya and Kovacocy breached fiduciary duties by not repaying Gen2's debts and instead paying themselves exorbitant compensation and issuing stock to Gaines and Lahr for no compensation. *Id.* at 23.  I therefore have supplemental jurisdiction over the counterclaims and third-party claim.

Once I have determined that I have supplemental jurisdiction, I may decline to exercise it for certain reasons. 28 U.S.C. § 1367(c).  But here I will exercise jurisdiction over the counterclaims and third-party claim.  The parties have already litigated aspects of their disputes in piecemeal fashion in three other court actions.  It best serves the parties and judicial economy to have all disputes resolved in this case rather than having Keasberry and Jamani initiate yet another round of litigation.

**C.  Claim Preclusion**

Gaines and Lahr argue that the counterclaims are precluded by two prior actions: (1) the Domestication Action in which Gaines and Lahr domesticated the Arizona default judgment against Keasberry and in which Jamani intervened, and (2) the Control Action that Keasberry brought against Serruya and Kovacocy in Nevada state court regarding who had the right to control Gen2.  Gaines and Lahr argue that the civil conspiracy claim was actually litigated in the Domestication Act, and that Keasberry and Jamani could have brought the same claims they now raise in either of these two cases.

Keasberry and Jamani argue that neither the Domestication Action nor the Control Action required them to assert the claims in this case as compulsory counterclaims, so they are not claim precluded.  As to the Domestication Action, they assert that Gaines and Lahr had no right to pursue the Series A Preferred Stock that was in Jamani's name in that case, as the court in that case found.  As to the Control Action, they assert that a dispute over who controlled Gen2 was

1  separate from whether Serruya and Kovacocy abused their power while they were in control.

2  They also contend there is no final judgment on the merits in the Control Action.  They argue the

3  cases do not involve the same parties because the Domestication Action did not involve Serruya

4  and Kovacocy, and the Control Action did not involve Gaines and Lahr.  Finally, they contend

5  that claim preclusion does not apply when a party from the prior action does not learn of its

6  claim until after its pleading in the first case.  Keasberry and Jamani assert that it was only after

7  all proceedings had commenced that they learned that Gen2 had issued stock to Gaines and Lahr

8  for no consideration.

9        The Control and Domestication Actions were filed in Nevada state court, while the

10  default judgment was obtained in Arizona.  Consequently, Nevada rules of claim preclusion

11  apply to the Control and Domestication Actions, while Arizona rules apply to the default

12  judgment. *See White v. City of Pasadena*, 671 F.3d 918, 926 (9th Cir. 2012).  Under both states'

13  law, the party asserting a judgment has preclusive effect bears the burden of proving it.

14  *Lawrence T. v. Dep't of Child Safety*, 438 P.3d 259, 261-62 (Ariz. Ct. App. 2019); *Bower v.*

15  *Harrah's Laughlin, Inc.*, 215 P.3d 709, 718 (Nev. 2009) (en banc), *modified on other grounds by*

16  *Garcia v. Prudential Ins. Co. of Am.*, 293 P.3d 869 (Nev. 2013) (en banc).  And both states apply

17  claim preclusion in similar circumstances where "(1) the final judgment is valid, (2) the

18  subsequent action is based on the same claims or any part of them that were or could have been

19  brought in the first case, and (3) the parties or their privies are the same in the instant lawsuit as

20  they were in the previous lawsuit, or the defendant can demonstrate that he or she should have

21  been included as a defendant in the earlier suit and the plaintiff fails to provide a good reason for

22  not having done so." *Weddell v. Sharp*, 350 P.3d 80, 85 (Nev. 2015) (simplified) (en banc); *see*

23  *also Lawrence T.*, 438 P.3d at 262.

Gaines and Lahr do not meet their burden with respect to any of the prior lawsuits.  As to the Nevada cases, they do not clearly identify who were parties or privies to each case, show that the Control Action resulted in a final judgment, or establish what claims were or could have been brought in which case between which parties.  Instead, they attach to their motion a few documents from the cases. ECF Nos. 9-1; 9-2; 9-3.  As for the Arizona default judgment, Gaines and Lahr do not show that Jamani, Serruya, or Kovacocy were parties or privies to that action or that it involved the same issues.  I will not search the state court dockets to make Gaines and Lahr's arguments for them.

Additionally, Gaines and Lahr do not address Keasberry and Jamani's argument that they could not have brought their claims in the other actions because they discovered the fact that Gaines and Lahr received stock from Gen2 after they filed their responsive pleadings (or defaulted) in the various actions. *See Mendenhall v. Tassinari*, 403 P.3d 364, 371 (Nev. 2017) (noting an exception from claim preclusion "for claims acquired after the responsive pleadings," including when "a party does not know of a claim until after its pleading"); *Lansford v. Harris*, 850 P.2d 126, 132 (Ariz. Ct. App. 1992) (stating that "a claim must be mature to be compulsory" and a claim that is not mature is not "subject to res judicata principles" (quotation omitted)); *Levin v. Hindhaugh*, 804 P.2d 839, 840 (Ariz. Ct. App. 1990) (stating that "a compulsory counterclaim must be asserted" to avoid claim preclusion, but to be compulsory, the claim "must be mature").  I therefore deny Gaines and Lahr's motion to dismiss based on claim preclusion.

**D.  Failure to State a Claim**

1.  Civil Conspiracy

Gaines and Lahr argue that this claim is not pleaded with particularity and there is no tort or unlawful objective identified as the conspiracy's purpose.  Alternatively, they contend that the

1   only purpose identified is their effort to execute on the Series A Preferred stock, but they assert

2   that this conduct is protected by the absolute litigation privilege.  Finally, they assert there is no

3   plausible allegation of damages because they never obtained the Series A Preferred stock.

4       Keasberry and Jamani respond that they have adequately pleaded the claim that Gaines

5   and Lahr accepted Gen2 stock for no consideration without crediting that as payment on Gen2's

6   debt and then pursued the Series A Preferred Stock at a critical moment in the dispute over the

7   control of Gen2.  They argue that the conspirators had the unlawful objective of converting

8   Jamani's Series A Preferred stock to obtain control of Gen2 and intended to abuse the court

9   process by pursuing the Domestication Action to aid Serruya and Kovacocy in the control

10  dispute.  They assert they have alleged damages from this conspiracy because Gaines and Lahr

11  received payments from Gen2 that should have been applied to the notes underlying the

12  Domestication Action, and because they expended attorney's fees in the Domestication Action.

13  Keasberry and Jamani argue that the litigation privilege does not apply because they allege a

14  conspiracy to obtain an unlawful objective and because the Domestication Action was not

15  brought in good faith.

16                          *a.  Litigation Privilege*

17      The Supreme Court of Nevada has adopted "the long-standing common law rule that

18  communications uttered or published in the course of judicial proceedings are absolutely

19  privileged, rendering those who made the communications immune from civil liability."

20  *Greenberg Traurig v. Frias Holding Co.*, 331 P.3d 901, 903 (Nev. 2014) (en banc) (quotation

21  omitted).  The privilege protects both "an attorney or a nonattorney" so long as the

22  communication at issue is "related to ongoing litigation or future litigation contemplated in good

23  faith." *Williams v. Lazer*, 495 P.3d 93, 100 (Nev. 2021) (en banc) (quotation omitted); *Bullivant*

*Houser Bailey PC v. Eighth Jud. Dist. Ct. of State ex rel. Cnty. of Clark*, No. 57991, 381 P.3d 597, 2012 WL 1117467, at *3 (Nev. 2012) (stating that the privilege applies to "conduct occurring during the litigation process" (emphasis and quotation omitted)).  The privilege protects from civil liability even knowingly false and malicious communications. *Greenberg Traurig*, 331 P.3d at 903.

The privilege's scope is "quite broad," and I should apply it "liberally." *Fink v. Oshins*, 49 P.3d 640, 644 (Nev. 2002).  Consequently, when determining whether the privilege applies, I resolve any doubt in favor of the privilege's application. *Id.*

The privilege is not without limits, however. *Greenberg Traurig*, 331 P.3d at 903.  The Supreme Court of Nevada has declined to apply it under circumstances that are "inconsistent with the public policy behind the privilege." *Dickerson v. Downey Brand LLP*, No. 67768, 408 P.3d 543, 2017 WL 6316552, at *3 (Nev. 2017).  "The litigation privilege is designed to ensure that attorneys have the utmost freedom to engage in zealous advocacy and are not constrained in their quest to fully pursue the interests of, and obtain justice for, their clients." *Id.* (quotation omitted).  But it "is not designed to provide attorneys with the ability to act malfeasant and then hide behind the privilege with impunity." *Id.*  The Supreme Court of Nevada thus declined to apply the privilege where an attorney "manipulated his position of influence with [an expert] and [the attorney's clients] in order to lower [the expert's] fees, raise his own fees, and, presumably, allow his clients funds they otherwise were not entitled to keep." *Id.*  Likewise, the privilege does not apply to a conspiracy to falsify nontestimonial evidence or "an expert's fraudulent acts." *Harrison v. Roitman*, 362 P.3d 1138, 1143 n.6 (2015) (en banc).

To determine whether the privilege applies, I also should examine whether the "gravamen" of the complaint is based on non-privileged actions rather than potentially privileged

communications. *Dickerson*, 2017 WL 6316552, at *4. For example, in *Dickerson*, the claims against the attorney were "not based on attorney-client communications or any communications between [the attorney] and [his clients] in which he provided legal advice." *Id.* Rather, the claims were "based on [the attorney] and [his clients'] failures to uphold the settlement agreement" through which the expert was to be paid. *Id.* The attorney thus "did more than just advise his clients that they had the option of not paying [the expert]; instead, he caused them to breach the contract by mendacious behavior." *Id.* Under those circumstances, the Supreme Court of Nevada concluded the district court did not err by refusing to apply the privilege. *Id.*

To the extent this claim is based on Gaines and Lahr filing the Arizona lawsuit and the Domestication Action, that is protected by the absolute litigation privilege. Keasberry and Jamani's argument that Gaines and Lahr were not acting in good faith when they filed the lawsuits is misplaced. The absolute litigation privilege protects even malicious conduct. The reference to good faith in Nevada's absolute litigation privilege caselaw concerns whether a pre-litigation statement is made in relation to future litigation that is contemplated in good faith. Here, Gaines and Lahr were not just contemplating litigation, they pursued it.

However, Keasberry and Jamani allege some conduct that is not protected by the privilege. They allege that Gaines and Lahr accepted stock from Gen2 without crediting the stock's value to the debt Gen2 owed and that Keasberry guaranteed. That conduct was unrelated to ongoing or future litigation and applying the policy behind the privilege does not support extending it to that conduct. Additionally, Gaines and Lahr allegedly used the writ to seek to attach Jamani's property rather than Keasberry's. Although this allegation is related to Gaines and Lahr obtaining the writ in the Domestication Action against Keasberry, the gravamen of the allegation is not based on the litigation-related communications. Rather, it is based on the out-

1  of-court course of conduct in trying to misuse the writ to try to obtain Jamani's property.  That is

2  akin to the conduct the Supreme Court of Nevada has held is not protected by the privilege.

3        I therefore grant in part and deny in part Gaines and Lahr's motion to dismiss based on

4  the absolute litigation privilege.  To the extent the civil conspiracy claim is based on Gaines and

5  Lahr's conduct in filing the Arizona lawsuit or the Domestication Action, it is dismissed with

6  prejudice because it is barred by the absolute litigation privilege.  To the extent the claim is

7  based on Gaines and Lahr accepting payment from Gen2 in the form of stock without crediting

8  that to Gen2's debt or trying to use the writ to obtain Jamani's Series A stock, then it is not

9  barred.

10                       *b.  Failure to State a Claim*

11        Under Nevada law, a civil conspiracy "consists of a combination of two or more persons

12  who, by some concerted action, intend to accomplish an unlawful objective for the purpose of

13  harming another, and damage results from the act or acts." *Consol. Generator-Nevada, Inc. v.*

14  *Cummins Engine Co.*, 971 P.2d 1251, 1256 (Nev. 1998) (per curiam) (quotation omitted).  The

15  unlawful objective does not necessarily need to be a tort.[6] *Cadle Co. v. Woods & Erickson, LLP*,

16  345 P.3d 1049, 1052 (Nev. 2015) (en banc).

17        The conspiracy counterclaim alleges that Gaines, Lahr, Serruya and Kovacocy conspired

18  to "steal the Series A Preferred Stock so that Serruya and Kovacocy could remain in their

19  director and officer positions at Gen2." ECF No. 7 at 19.  According to the counterclaim, this

20  was done through Gaines and Lahr using the writ from the Domestication Action to attempt to

21  seize the Series A stock during a critical moment in the control fight, in exchange for Serruya

22

23

---

[6] Gaines and Lahr thus are incorrect when they state in their motion that to state a civil
conspiracy claim, Keasberry and Jamani must allege an underlying tort. *See* ECF No. 9 at 16.

1   and Kovacocy authorizing Gen2 to issue stock to Gaines and Lahr for no consideration. *Id.* at 17-

2   20.  The counterclaim alleges that the unlawful objective was "to seize the Series A Preferred

3   Stock and, consequently, control of Gen2." *Id.* at 20.

4          This claim suffers a defect that infects both the counterclaims and the parties' briefs.  It

5   lumps the parties together in circumstances where the parties' rights, duties, and interests are not

6   necessarily the same.  For example, in relation to the alleged attempt to seize the stock, if

7   Keasberry no longer owned the stock, it is unclear how he was harmed by attempts to seize it.

8   Similarly, the claim does not identify what damages the conspiracy caused Jamani because the

9   attempt at seizing his stock failed. *Id.* at 17-18 (alleging that the stock transfer agent refused

10  Serruya's request to transfer the Series A stock the night before the election).  Keasberry and

11  Jamani cannot cure these defects through explanations in their opposition. *See Applied*

12  *Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 897 (9th Cir. 2019).

13         I therefore grant Gaines and Lahr's motion to dismiss this claim.  However, because it is

14  not clear that amendment would be futile, I grant Keasberry and Jamani leave to amend. *Sonoma*

15  *Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1118 (9th Cir. 2013) ("As a

16  general rule, dismissal without leave to amend is improper unless it is clear . . . that the

17  complaint could not be saved by any amendment." (simplified)).

18              2.  Aiding and Abetting

19         Gaines and Lahr argue the aiding and abetting claim depends on the breach of fiduciary

20  duty claim against Serruya and Kovacocy, which fails under the business judgment rule.  They

21  also argue there are no plausibly alleged nonconclusory facts about how they aided and abetted

22  Serruya and Kovacocy's breach of fiduciary duty.  Finally, they assert that this claim is barred by

23  the statute of limitations.

Keasberry and Jamani argue that Serruya and Kovacocy owed fiduciary duties to Keasberry and Jamani as shareholders and directors of Gen2, and they breached those duties by failing to repay Gen2's debt and instead enriching themselves. They contend that Gaines and Lahr knowingly participated in the breach by not seeking repayment from Gen2 and accepting stock from Gen2 but not applying that value to the debt. Finally, they argue that the claim cannot be dismissed at this stage based on the statute of limitations.

### a. Statute of Limitations

"A claim may be dismissed as untimely pursuant to a 12(b)(6) motion only when the running of the statute of limitations is apparent on the face of the complaint." *United States ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*, 720 F.3d 1174, 1178 (9th Cir. 2013) (simplified). A limitations period begins to run "from the day the cause of action accrued." *Clark v. Robison*, 944 P.2d 788, 789 (Nev. 1997) (per curiam). A cause of action generally accrues "when the wrong occurs and a party sustains injuries for which relief could be sought." *Petersen v. Bruen*, 792 P.2d 18, 20 (Nev. 1990); *see also State ex rel. Dep't of Transp. v. Pub. Emps.' Ret. Sys. of Nev.*, 83 P.3d 815, 817 (Nev. 2004) (en banc) ("A cause of action 'accrues' when a suit may be maintained thereon." (quotation omitted)). Outside the context of the attorney-client relationship, a "breach of fiduciary duty is fraud" and is therefore subject to a three-year statute of limitation. *Nev. State Bank v. Jamison Fam. P'ship*, 801 P.2d 1377, 1382 (Nev. 1990) (per curiam) (citing Nev. Rev. Stat. § 11.190(3)(d)). "However, the statute of limitation will not commence to run until the aggrieved party knew, or reasonably should have known, of the facts giving rise to the breach." *Id.*

The breach of fiduciary duty and related aiding and abetting claims allege facts taking place within three years of the counterclaim, including Serruya and Kovacocy causing Gen2 to

1 pay its officers and directors millions of dollars in 2020, failing to pay Gen2's debts while

2 enriching themselves, and issuing stock to Gaines and Lahr in 2020 and 2021 for no

3 consideration. ECF No. 7 at 12, 16, 19.  I therefore deny this portion of Gaines and Lahr's

4 motion because it is not apparent from the face of the counterclaim that this claim is untimely.

5 *b.  Failure to State a Claim*

6 "Aiding and abetting the breach of a fiduciary duty has four required elements: (1) there

7 must be a fiduciary relationship between two parties, (2) that the fiduciary breached, (3) the

8 defendant third party knowingly and substantially participated in or encouraged that breach, and

9 (4) the plaintiff suffered damage as a result of the breach." *Guilfoyle v. Olde Monmouth Stock*

10 *Transfer Co.*, 335 P.3d 190, 198 (Nev. 2014) (en banc).  To establish the second element that

11 Serruya and Kovacocy breached their fiduciary duties, the counterclaim must plausibly allege

12 facts that (1) "rebut the business judgment rule" and (2) "demonstrate a breach of fiduciary duty

13 involving intentional misconduct, fraud, or another knowing violation of the law." *Guzman v.*

14 *Johnson*, 483 P.3d 531, 535-36 (Nev. 2021) (en banc) (citing Nev. Rev. Stat. § 78.138(7)).  "The

15 business judgment rule states that 'directors and officers, in deciding upon matters of business,

16 are presumed to act in good faith, on an informed basis and with a view to the interests of the

17 corporation.'" *Chur v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 458 P.3d 336, 340 (Nev.

18 2020) (en banc) (quoting Nev. Rev. Stat. § 78.138(3)).

19 The breach of fiduciary claim alleges that Serruya and Kovacocy owed fiduciary duties to

20 Keasberry as a shareholder of Gen2. ECF No. 7 at 21.  Serruya and Kovacocy allegedly breached

21 this duty by enriching themselves while failing to pay Gen2's debts. *Id.*  The aiding and abetting

22 claim alleges that Serruya and Kovacocy breached a fiduciary duty to Keasberry, that Gaines and

23 Lahr knew that conduct breached duties owed to "Counterclaimants," and that Gaines and Lahr

intentionally assisted the breach of a duty owed to "Plaintiff." *Id.* at 23. It then alleges that as a result, "Counterclaimants" have been damaged. *Id.* at 24. It thus is unclear who is asserting this claim and in what capacity.[7] In their opposition brief, Keasberry and Jamani assert that fiduciary duties were owed to both of them as shareholders and directors of Gen2. ECF No. 11 at 19. These shifting allegations and arguments do not give Gaines and Lahr fair notice of who is asserting the claim, in what capacity, and on what factual basis. *See Echlin v. PeaceHealth*, 887 F.3d 967, 977 (9th Cir. 2018) (stating that a complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests" (quotation omitted)). I therefore dismiss this claim, with leave to amend.

### 3.  Claims Against Serruya and Kovacocy

Keasberry and Jamani argue that Gaines and Lahr have no standing to seek dismissal of the counterclaims against Serruya and Kovacocy. I decline to consider arguments Gaines and Lahr make on behalf of Serruya and Kovacocy except for the aiding and abetting claim because it is based on Serruya and Kovacocy's breach of fiduciary duty. Keasberry and Jamani are granted leave to amend the breach of fiduciary duty claim against Serruya and Kovacocy consistent with my ruling on the aiding and abetting claim. Gaines and Lahr did not move to dismiss the equitable indemnity claim, nor would they have standing to do so, so that claim remains pending.

/ / / /

---

[7] Generally, "a corporate director or officer owes fiduciary duties to the corporation, not the shareholders, and the shareholders may enforce the fiduciary duties through derivative actions." *Parametric Sound Corp. v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 401 P.3d 1100, 1105 n.10 (Nev. 2017) (en banc). There may be circumstances where a director or officer owes fiduciary duties to a shareholder. *Id.* If this is meant to be a derivative action, then the counterclaimants should make that clear in an amended pleading. *See id.* at 1106-08 (discussing the difference between direct and derivative claims).

**III.  CONCLUSION**

I THEREFORE ORDER that the plaintiffs' motion to dismiss **(ECF No. 9) is**

**GRANTED in part** as set forth in this order.

I FURTHER ORDER that counterclaimants Brian Keasberry and Aarif Jamani may file

amended counterclaims by August 25, 2023.

DATED this 25th day of July, 2023.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE

20